OPINION
On May 17, 2000, the Stark County Grand Jury indicted appellant, Craig Bailey, on one count of rape in violation of R.C. 2907.02, one count of kidnapping in violation of R.C. 2905.01 and one count of felonious assault in violation of R.C. 2903.11. All counts carried firearm and repeat violent offender specifications. Said counts arose from incidents on May 6, 2000 involving Megan McKernan and her sister-in-law, Stephanie McKernan.
Prior to trial, appellant filed numerous motions to suppress, including a motion to suppress his statements made to police. Following hearings on August 21 and 28, 2000, the trial court denied said motion.
A jury trial commenced on September 5, 2000. The jury found appellant guilty on all three counts including the firearm specifications. The trial court found appellant guilty of the repeat violent offender specifications. By judgment entry filed September 13, 2000, the trial court sentenced appellant to a total aggregate term of fifty-two years in prison.
Appellant filed an appeal and this matter is now before this court for consideration. Assignments of error are as follows:
 I THE APPELLANT WAS DEPRIVED OF A FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT.
 II THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS.
 III
THE TRIAL COURT ERRED IN ADMITTING THE 911 TAPE.
 IV THE APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 V THE RECORD DOES NOT SUPPORT THE SENTENCE IMPOSED BY THE TRIAL COURT.
 I
Appellant claims he was deprived of a fair trial due to prosecutorial misconduct. Specifically, appellant claims the prosecutor improperly permitted answers that implied appellant had invoked his Fifth Amendment right to remain silent, and improperly commented on appellant's failure to testify, the credibility of the state's witnesses and appellant's personality. We disagree.
At the outset, we note no objections were raised to the complained of questions and comments. An error not raised in the trial court must be plain error for an appellate court to reverse. State v. Long (1978),53 Ohio St.2d 91; Crim.R. 52(B). In order to prevail under a plain error analysis, appellant bears the burden of demonstrating that the outcome of the trial clearly would have been different but for the error. Long. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. at paragraph three of the syllabus.
The test for prosecutorial misconduct is whether the prosecutor's comments and remarks were improper and if so, whether those comments and remarks prejudicially affected the substantial rights of the accused.State v. Lott (1990), 51 Ohio St.3d 160, certiorari denied (1990),112 L.Ed.2d 596. In reviewing allegations of prosecutorial misconduct, it is our duty to consider the complained of conduct in the context of the entire trial. Darden v. Wainwright (1986), 477 U.S. 168.
TESTIMONY ELICITED ABOUT APPELLANT'S RIGHT TO REMAIN SILENT
Appellant complains of the following exchange between the prosecutor and Detective Tim Taylor on direct examination:
 Detective, when you arrested the Defendant, was the Defendant informed of the charges against him and the date in which the crime had occurred?
Yes, he was.
Did he respond in any way to that statement?
He didn't respond at all to us.
 Okay. Did he make any statements to you in regard to that evening?
 * * * At that point we gave him a Miranda. We asked him at that point if he was going to make a statement or if he would like to. He said he wanted an attorney —
T. at 455-456.
Appellant also complained of the following exchange between the prosecutor and Detective Ty Bissler on direct examination:
Did he give a statement?
No, he invoked his right to have an attorney.
T. at 483.
Both times the prosecutor did not elicit any further comments from the detectives. Following the exchange with Detective Taylor, the prosecutor directed the testimony to statements made by appellant while in the police cruiser regarding an alibi. T. at 456-458, 483. Although the prosecutor engaged in a tortured avenue to appellant's alibi statements, we cannot say it was an intentional violation of State v. Rogers (1987)32 Ohio St.3d 70, and State v. Combs (1991), 62 Ohio St.3d 278. The questioning did lead to an admissible statement (Assignment of Error II) and therefore any prejudice created was outweighed by the admissible statement. Prosecutors cannot be held responsible for non-responsive answers and volunteered statements by police officers when there are legitimate reasons for the questions.
 COMMENTS ON APPELLANT'S FAILURE TO TESTIFY
Appellant complains of the following comment made by the prosecutor during final closing argument regarding appellant's failure to testify:
 * * * Where is the evidence to support that? Did anybody come in here and say that besides that man? Anybody?
T. at 716.
Taken in a vacuum, it appears appellant's assignment of error is correct. However, a fair reading of the entire statement leads us to a different conclusion. The prosecutor was actually commenting on matters argued by defense counsel in opening statement:
 * * * In Mr. Pitinii's opening statement, he indicated to you that all three [Appellant, Megan and Stephanie] were drinking, all three were drinking behind Dave Young's house, they were having a nice little party, laughing, flirting, remember that?
T. at 716.
 COMMENTS ON APPELLANT'S PERSONALITY
Appellant complains of the following comment made by the prosecutor during final closing argument regarding appellant's personality:
 Some people are pathological. I submit to you that that man is pathological.
T. at 718.
During closing argument, defense counsel raised the specter that the victims were lying and had misstated what had happened. Defense counsel alluded to Megan being a "[t]ough girl" and "[r]ough" and raised questions about appellant's conduct given the facts that appellant did not ejaculate inside the victim, smoked a cigarette with her afterwards and offered her a ride home so she would not have to walk in her bare feet. T. at 707, 710, 713. We find the prosecutor's comment on appellant's pathological acts was directly linked to defense counsel's closing argument and was made in response to defense counsel's comments:
 * * * Mr. Pitinii asked you to think about how nice that man is, how nice he is that he did not ejaculate in her. What type of person, he asked you, would do this, do this act and act the way he did? He is asking you, he is posing at you the question that a person would not act like this, not act like it in that manner, why would he be so nice afterwards and be so incredibly barbaric before? Well, there are a few answers to that; and we are never going to know. But you can garner your own conclusions, and I can submit to you a suggestion. Some people are pathological. I submit to you that that man is pathological.
T. at 717-718.
 COMMENTS ON CREDIBILITY OF WITNESSES
Appellant complains of the following comment made by the prosecutor during closing argument regarding the credibility of the state's witnesses:
 It is not a stretch of the imagination to think, hey, what those two girls stated, that certainly sounds like the truth to me.
T. at 676.
Once again, we might accept appellant's argument viewing the statement standing alone. However, the prosecutor was comparing the statements of the two witnesses with the physical evidence i.e., barrel of a shotgun, found at the scene. Although we do not condone vouching for the credibility of a witness, we cannot say it rose to the level of plain error.
Upon review, we do not find any comments made by the prosecutor that prejudicially affected appellant's substantial rights.
Assignment of Error I is denied.
 II
Appellant claims the trial court erred in denying his motion to suppress his statements which were made while he was being transported in a police cruiser after arrest, but prior to the investigation andMiranda warnings. We disagree.
There are three methods of challenging on appeal a trial court's ruling on a motion to suppress. First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are again the manifest weight of the evidence. State v. Fanning (1982), 1 Ohio St.3d 19;State v. Klein (1991), 73 Ohio App.3d 485; State v. Guysinger (1993),86 Ohio App.3d 592. Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. State v. Williams (1993), 86 Ohio App.3d 37. Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. State v.Curry (1994), 95 Ohio App.3d 93; State v. Claytor (1993),85 Ohio App.3d 623; Guysinger. As the United States Supreme Court held inOrnelas v. U.S. (1996), 116 S.Ct. 1657, 1663, ". . . as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."
In its judgment entry filed May 4, 2001, supplementing the appellate record, the trial court correctly set forth the facts of the statement as follows:
 On April 9, 2000, Officers Bissler and Taylor of the Jackson Township Police Department arrested the defendant and were transporting him to the Jackson Township Police Department. During the ride to the police department, the defendant was asked if he had any idea why he was being arrested. The defendant responded by saying that he had no idea why he was being arrested. The officers then informed the defendant that he was being arrested because he was believed to be responsible for a rape that took place in Jackson Township on a certain date. After he was informed of the reason for his arrest, the defendant then volunteered that he had no idea of what the officers were talking about and that on the night in question he was drinking with his father.
The trial court concluded "[t]he officers had not asked the defendant to explain his whereabouts that evening, nor did the officers ask him any questions which would elicit his volunteered response regarding his whereabouts."[1]
In Rhode Island v. Innis (1980), 446 U.S. 291, 300-302, then Justice Stewart described "interrogation" as follows:
 We conclude that the Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.
Detective Bissler testified he and Detective Taylor arrested appellant, told him the crime he was charged with and did not say anything else to him. August 21, 2000 T. at 68-69. Appellant volunteered he had no idea what they (the police) were talking about because he had been drinking with his father that night. Id. Detective Christopher Rudy testified he had never been informed by the officers of appellant's statement about being with his father before he Mirandized him. August 28, 2000 T. at 13-14. Detective Rudy testified appellant made the same statement to him following the Miranda warnings. Id. at 14.
We concur with the trial court that there was no interrogation of appellant by the police. The police merely asked appellant if he knew what he was being arrested for and informed him of the reason for the arrest. These statements do not qualify as "interrogation" as defined by Innis.
Upon review, we find the trial court did not err in denying appellant's motion to suppress his statements which were made in the police cruiser.
Assignment of Error II is denied.
 III
Appellant claims the trial court erred in admitting the 911 call when it was not disclosed during discovery. We disagree.
The admission or exclusion of evidence lies in the trial court's sound discretion. State v. Sage (1987), 31 Ohio St.3d 173. In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217.
The 911 tape was not provided to appellant until one and one-half hours prior to its introduction. T. at 316. It was the state's position that the existence of the 911 tape was just as much a surprise to them as to appellant. T. at 317-318. The prosecutor stated he asked for "all the evidence" from the NDN and the Jackson Township Police Department but the 911 tape was never turned over to the prosecutor's office. T. at 317-319. The investigating officer told the prosecutor he had forgotten about the tape. T. at 320. Although the trial court found it was a sloppy oversight on behalf of the police department, it permitted the tape's entry as evidence. T. at 322.
Pursuant to Crim.R. 16(D), the state has a continuing duty to disclose additional evidence and allow inspection and discovery.[2] Further, under subsection (E)(3), the trial court, upon a finding of failure to comply, may order "discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."
Upon review, we find the trial court followed the dictates of Crim.R. 16(E)(3) and addressed the situation as it saw fit. We cannot find the path chosen by the trial court was an abuse of discretion.
Assignment of Error III is denied.
 IV
Appellant claims his conviction was against the manifest weight of the evidence. We disagree.
On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. State v. Jenks (1991), 61 Ohio St.3d 259. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."State v. Martin (1983), 20 Ohio App.3d 172, 175. See also, State v.Thompkins (1997), 78 Ohio St.3d 380. The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Martin at 175.
Appellant was convicted of rape in violation of R.C. 2907.02 which states in pertinent part "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Appellant was also convicted of kidnapping in violation of R.C. 2905.01 which states in pertinent part as follows:
 No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will;
 Lastly, appellant was convicted of felonious assault in violation of R.C. 2903.11 which states in pertinent part:
 No person shall knowingly do either of the following:
 Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.
In support of his argument, appellant points to inconsistencies in the victims' statements i.e., amount of alcohol consumed, whether lewd comments were made, whether Megan claimed to have had a boyfriend, and presents an alternative scenario that was argued by defense counsel in closing argument:
 From the Appellant's perspective, what appears to have happened is that two young women were out very late at night. The Appellant approached the women and asked if they had boyfriends. Megan replied she did not. Stephanie had been drinking, and the women were basically hanging out at Stephanie's home. The Appellant leaves and returns for Megan. Stephanie who for whatever reason is agitated that Megan is leaving with Appellant. Stephanie attacks the Appellant causing much of the disarray which was found at the scene.
 Appellant and Megan leave in the Appellant's truck. He asks her for oral sex, and she declines. Intercourse takes place followed by the Appellant's comment that he could marry a girl like Megan. They share a cigarette and a beer. He takes her home because she has no shoes on although she offered to walk. While they were gone, Stephanie calls the police because of her altercation with the Appellant.
Appellant's Brief at 14-15.
With the blood, fingerprint and DNA evidence, appellant conceded he was there, but claimed the sexual conduct was consensual. T. at 186, 709. Appellant claimed Megan voluntarily went with him to Forty Corners Road and Boyd's Corner. T. at 186. In support of this theory, we have no direct evidence but merely defense counsel's argument and his interpretation of the testimony presented.
Megan testified she first encountered appellant at the end of her driveway when he asked if either she or Stephanie had a boyfriend. T. at 218-219. Megan then observed appellant pull into the neighbor's driveway and back up toward the house. T. at 220. Megan and Stephanie ran with a flashlight to see what was going on at the neighbor's. T. at 222-223. Appellant walked toward the women and stood in front of them. T. at 223-224. Appellant claimed to be a Jackson Township police officer and told the women to come with him. T. at 225. When the women refused to go with him, appellant pointed a gun at them and asked if they "wanted to die." T. at 225-226. Megan hit the gun down and a fight began. T. at 226-227. Appellant grabbed Stephanie and Megan hit appellant with a flashlight.[3] T. at 227. Both women attempted to run, but appellant grabbed Megan by the hood of her sweatshirt, flipped it over her head, grabbed by the hair, took her to his vehicle by dragging her on her back and drove off with her. T. at 227, 233-234. Megan lost her sweatshirt and shoes during the struggle which were found by the police later that evening. T. at 231-233, 438. When appellant put Megan in the vehicle, he pushed her, hit her and choked her. T. at 235. After appellant got Megan on his lap with his arm around her throat, he drove off. T. at 235.
After appellant and Megan arrived at Riverside/Forty Corners Road, appellant asked Megan if there were any reasons why he shouldn't kill her. T. at 237. Appellant still had the gun. T. at 238. Appellant directed Megan to take off her clothes which she did because "he said he'd kill me."[4] T. at 238-239. While appellant's vehicle was parked on Boyd's Corner, appellant had vaginal intercourse and oral sex with Megan. T. at 242, 245-246, 294. After appellant finished, he told Megan he would take her home, but dropped her off at Forty Corners Road instead. T. at 246-248. Megan identified appellant as the offender and his vehicle as the one used during the incident. T. at 252, 255, 258.
Stephanie confirmed Megan's account of the first time they saw appellant. T. at 349-350, 353-355. Stephanie testified appellant pointed a gun at them and told them to come with him or he would kill them. T. at 356. A struggle ensued and Stephanie attempted to spray appellant with spray paint, but she was hit in the head with the butt of the gun. T. at 356-358. Stephanie escaped and called 911. T. at 359. Stephanie also identified appellant and appellant's vehicle. T. at 363.
The physical evidence from the scene of the abduction was compatible with the description given by both women. State's Exhibits 22, 26, 73, 94, 97. Detective Taylor described Megan's demeanor that evening as crying, upset and disheveled, with her T-shirt and jeans covered in blood and mud, wearing no shoes, with bruises on her lips and arms. T. at 433; State's Exhibits 126-A thru K. When appellant was arrested, his vehicle was searched and a gun barrel was retrieved. T. at 452.
Apart from cross-examination, there was no evidence offered to rebut the crimes of rape and kidnapping. The only evidence offered to rebut the crime of felonious assault was that of the emergency room doctor who testified Stephanie's injuries were not consistent with being struck with a gun. T. at 657. However, appellant was indicted for felonious assault and in particular for "knowingly, cause or attempt to cause physical harm to Stephanie McKernan, by means of a deadly weapon***." There is sufficient evidence to establish that appellant pointed a gun at Stephanie's head, threatened to kill her and during a struggle, she was hit with an object.
The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. State v. Jamison (1990),49 Ohio St.3d 182, certiorari denied (1990), 498 U.S. 881.
We do not find the jury lost its way in accepting the accounts given by the women which were consistent with the observations of the police officers and the physical evidence found. Upon review, we find sufficient credible evidence of rape, kidnapping and felonious assault, and no manifest miscarriage of justice.
Assignment of Error IV is denied.
 V
Appellant claims the record does not support the sentence imposed by the trial court. We disagree.
By judgment entry filed September 13, 2000, the trial court sentenced appellant to maximum sentences. R.C. 2929.14(C) governs maximum sentencing and states as follows:
 Except as provided in division (G) of this section or in Chapter 2925. of the Revised Code, the court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders under division (D)(3) of this section, and upon certain repeat violent offenders in accordance with division (D)(2) of this section.
Subsection (D)(2) states:
 If an offender who is convicted of or pleads guilty to a felony also is convicted of or pleads guilty to a specification of the type described in section 2941.149 of the Revised Code that the offender is a repeat violent offender, the court shall impose a prison term from the range of terms authorized for the offense under division (A) of this section that may be the longest term in the range and that shall not be reduced pursuant to section 2929.20, section 2967.193, or any other provision of Chapter 2967. or Chapter 5120. of the Revised Code.
 If the court imposing a prison term on a repeat violent offender imposes the longest prison term from the range of terms authorized for the offense under division (A) of this section, the court may impose on the offender an additional definite prison term of one, two, three, four, five, six, seven, eight, nine, or ten years if the court finds that both of the following apply with respect to the prison terms imposed on the offender pursuant to division (D)(2)(a) of this section and, if applicable, divisions (D)(1) and (3) of this section:
 The terms so imposed are inadequate to punish the offender and protect the public from future crime, because the applicable factors under section 2929.12 of the Revised Code indicating a greater likelihood of recidivism outweigh the applicable factors under that section indicating a lesser likelihood of recidivism.
 (ii) The terms so imposed are demeaning to the seriousness of the offense, because one or more of the factors under section 2929.12 of the Revised Code indicating that the offender's conduct is more serious than conduct normally constituting the offense are present, and they outweigh the applicable factors under that section indicating that the offender's conduct is less serious than conduct normally constituting the offense.
Specifically, appellant argues the maximum sentences and the maximum additional sentence for the repeat violent offender specification are only to be given to "the most deserving offenders." State v. Edmonson
(1999), 86 Ohio St.3d 324, 328. We note appellant had been previously convicted of a crime of violence (aggravated burglary)[5] and was out of prison only nineteen days when the crimes sub judice occurred. T. at 801-802. We concur with the trial court's finding that appellant "poses the greatest likelihood of recidivism" and "a maximum basic prison term is inadequate to protect the public." See, Judgment Entry filed September 13, 2000.
R.C. 2929.14(E)(4) governs consecutive sentences and states as follows:
 If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
* * *
 The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.
At the conclusion of the sentencing hearing, the trial court found the following:
 The Court finds that consecutive sentences are necessary to fulfill the purposes of Revised Code 2929.11 and not disproportionate to the seriousness of the Defendant's conduct or to the danger the Defendant poses.
T. at 820.
The trial court also stated the following in its judgment entry filed September 13, 2000:
 The Court also finds that the defendant committed these multiple offenses while the defendant was under a post release control sanction when the offenses were committed and the harm caused by the defendant was so great or unusual that no single course of conduct adequately reflects the seriousness of the defendant's conduct. Further, the defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the defendant.
Further, the trial court was present during the entire trial and was able to see the victims, judge their credibility and determine the seriousness of appellant's conduct.
Upon review, we find the trial court fulfilled the requirements of R.C. 2929.11 and R.C. 2929.14.
Appellant also argues the crimes do not have a separate animus. R.C.2941.25 governs multiple counts and states as follows:
 Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.
If rape and kidnapping are to be found to be of like or similar import, the matter is subject to the guidelines set forth in State v.Logan (1979), 60 Ohio St.2d 126, 135:
 The primary issue, however, is whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense.***
 We adopt the standard which would require an answer to the further question of whether the victim, by such limited asportation or restraint, was subjected to a substantial increase in the risk of harm separate from that involved in the underlying crime. If such increased risk of harm is found, then the separate offense of kidnapping could well be found.***
Appellant dragged and forced Megan into his vehicle, drove her to two separate locations and restrained her by the throat by force and with a gun. During the time appellant held her captive, he threatened to kill her. At one location, appellant raped her. We find there was a risk of harm, separate and apart from the rape. The felonious assault charge was against Stephanie, a separate victim from the rape and kidnapping, and therefore there is a total separate animus.
Upon review, we find the trial court did not err in sentencing appellant to consecutive maximum sentences.
Assignment of Error V is denied.
The judgment of the Court of Common Pleas of Stark County, Ohio is hereby affirmed.
 JUDGMENT ENTRY
For the reasons stated in the Memorandum-Opinion on file, the judgment of the Court of Common Pleas of Stark County, Ohio is affirmed.
Farmer, J.
Edwards, P.J. and Wise, J. concur.
[1] It should be noted appellant's statement that he was elsewhere was not incriminating but was inconsistent with the defense of consent.
[2] There was no request for further discovery on this issue nor a request for a continuance.
[3] Upon arrest appellant had a crescent-shaped bruise on his head comparable to a flashlight. T. at 448; State's Exhibit 131-A.
[4] Megan's shirt had been ripped and her necklace had blood and dirt on it. T. at 241; State's Exhibits 143-C and 143-E.
[5] Physical harm to that victim was alleged in the indictment. T. at 795.